THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* WILLIE DEVINE, JR., Defendant-Appellee.

(No. 12115; )

Fourth District—March 21, 1974.

Basil G. Greanias, State's Attorney, of Decatur (Patrick M. Walsh, Assistant State's Attorney, of counsel), for the People.

John F. McNichols, Deputy Defender, of Springfield (John L. Swartz, Assistant Appellate Defender, of counsel), for appellee.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

This is an appeal by the People from an order of the circuit court of Macon County allowing a motion to suppress certain confessions and statements.

The defendant Willie Devine, whose age is variously described in the record as either 13 or 15, and one Joe Edward Baker, age 15, were charged with the murder of William Eifert. Before trial, both defendants filed motions to suppress. The motion of defendant Baker was granted and upon an appeal this court affirmed (*People v. Baker*, 9 Ill.App.3d 654, 292 N.E.2d 760), and the supreme court denied leave to appeal (*People v. Baker*, 53 Ill.2d 606). On October 16, 1972, the same trial court judge entered an order suppressing the confession and statements of the defendant Devine taken during the period of time from September 10, 1971, to September 11, 1971, being the same period of time involved in the Baker case and under similar, if not identical, circumstances.

The role question before this court is whether the finding by the trial court that the defendant did not voluntarily, knowingly, and intelligently waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602, is against the manifest weight of the evidence. A consideration of that issue necessitates a recitation or summary of the evidence.

The defendant was taken into custody while walking on a street near his home in the city of Decatur on September 10, 1971. He was taken to the Decatur police station and arrived there at around 7:30 P.M. Thomas Butts, a Decatur police officer, testified that he had a brief interview with defendant after the defendant was booked and placed in his cell. At that time, Butts orally advised the defendant of his *Miranda* rights. Butts testified that he was aware of defendant's learning disability and was careful in the explanation of the *Miranda* rights. He further stated that during this interview that defendant was crying and was upset, although he appeared to understand his constitutional rights. The defendant at that time denied any involvement in the murder and kept insisting that he wanted to go home. Officer Coventry, also a Decatur policeman, testified that he interviewed the defendant on September 10, 1971, shortly after Butts interviewed him. Since Baker, a co-defendant, had implicated the defendant Devine, Coventry went to defendant and asked him if he would rather tell the truth now, if he wanted to give a different statement in talking to the police about the matter. Coventry then took the defendant to an interrogation room at the police station where two other persons, Gregory and Collins, were present. In the interrogation room, the defendant was again advised of his *Miranda* rights, this time by Wade Gregory, a juvenile officer. Upon this occasion, the defendant stated that he knew and understood the rights as they were explained to him. The defendant asked several times if he could call his mother. Officer Coventry stated that defendant was not crying during the interview with Gregory and Collins but he was crying during the interview with Officer Butts. Furthermore, the defendant had been incoherent prior to the Collins-Gregory interrogation and had made an attempt at suicide at the time he was booked into the jail. Coventry stated that when the defendant was advised of his rights by Gregory, no inquiry was made into the defendant's educational background, although inquiry was made as to whether or not he could read.

Wade Gregory, a parole counselor with the Illinois Department of Corrections, testified that he was familiar with defendant and his learning disabilities. He stated that he saw defendant being arrested on September 10, 1971, and proceeded to go to defendant's mother's house to advise her that her son had been taken into custody for investigation for

murder. He then offered to take her to the station, but she stated, "You keep him there until you are through with him." When he went to the station, he heard Willie crying for him and he then talked with Willie and calmed him somewhat. He then did not see defendant until Officer Coventry advised him that Willie was ready to talk. When Willie was brought in, he took a constitutional consent form and advised and explained to Willie what his rights were. He then testified that he read and explained the right to remain silent and asked Willie if he understood it at which point Willie said, "Yes". He was then asked to initial, and he proceeded to initial, that part of the consent form. A similar procedure was followed in reading and explaining his other rights. For each one, defendant stated "yes" and initialed the consent form. Defendant had no questions and signed the bottom of the form. Gregory further stated that he spent 5 to 6 minutes advising defendant of his rights. The oral interview then commenced at 9:30 P.M. Defendant made various oral statements in narrative form in a "well-composed, business-like fashion". Before defendant was advised of his rights by Gregory, defendant asked him if he could call his mother. After the oral interview, defendant requested Gregory to call his mother but Gregory stated that he should do it himself. He further stated that he felt defendant understood the rights that he waived and that he tried to relate to him at a level that he thought he could understand. However, on cross-examination, Gregory stated that he explained defendant his rights in the same manner in which he generally advised people of their rights. He further stated that on the evening Willie was questioned there was no attorney and no family member present. Furthermore, defendant was more calm and rational while giving the later written statement than while giving the oral statements. After the oral interview with Collins, Coventry, and Gregory, defendant was taken back to his cell for rest.

Shortly after allowing this rest from the oral interview, members of the State's Attorney's office arrived at the station at 10 P.M. It was then that defendant gave a written statement and confession. Milo J. See, an assistant State's Attorney, testified that he took the written statements from defendant on that evening. He stated that he admonished defendant of his constitutional rights under *Miranda* before taking his statement. After each question, he asked defendant if he understood and defendant answered affirmatively. He stated that there was never any indication that defendant didn't understand what was transpiring. However, he stated that he got the impression that defendant wasn't completely literate. He stated that the statement was signed at about 11:30 P.M., but wasn't transcribed until much later. At the time defendant signed, he appeared to be alert, awake and aware. On cross-examination,

he stated that defendant was allowed to call home *after* the statement was taken. He also stated that during this call defendant was upset and crying a bit. After the statement was typed, it was signed by defendant after being read back to him. After signing the statement, defendant was taken back to his cell—it being about 4 A.M. Defendant appeared at a detention hearing at 9 A.M.

Gordon Hannon, a Decatur juvenile officer, testified that he had worked in the past with defendant. He stated that it was very difficult to communicate with defendant, "and it seemed as though he had difficulty in understanding even a simple question." He stated that he had advised defendant of his *Miranda* rights in the past and defendant always stated he understood, but he was uncertain as to whether he really did.

Roy E. Glick, a Decatur juvenile officer, testified that he was familiar with Willie and his family. He stated that he frequently had trouble communicating with defendant. He stated that it was his opinion at defendant's competency hearing that defendant could not understand the nature of the proceedings against him and could not assist in his own defense.

Gertrude Cheeks, a special education teacher, testified that defendant was in her "educable mentally handicapped" class. She further stated that defendant in the 1971 school year was reading at a 2.5 grade level. She also testified that different methods and visual aids were used to get a specific point across to defendant, and that defendant had only a 30-minute attention span. She further stated that defendant was only present in class one-fourth of the time. It was then stipulated that based on the latest psychiatric examination, defendant's mental age was 7.

On October 16, 1972, the trial judge entered an order suppressing the confession and statements and finding that defendant "did not intelligently or knowingly waive his constitutional rights to remain silent, to have an attorney present during interrogation, or to have the court appoint an attorney to be present during interrogation if he was unable to afford one." On October 18, 1972, the State filed a notice of appeal pursuant to Supreme Court Rule 604(a) (Ill. Rev. Stat. 1971, ch. 110A, par. 604(a)).

In *People v. Baker*, we discussed in detail the decisions applicable to the review of an order allowing a motion to suppress the confession or the statement. We see no necessity for a repetition of the discussion there found.

As in *Baker*, we deal here with a youthful defendant of below normal intelligence. In fact, the trial judge expressly stated that the defendant's intelligence was, in his judgment, less than that of the defendant Baker.

The record shows that the defendant was in a special class for the educable mentally handicapped; that defendant was reading at a second-grade level; that he had a low IQ; that he had a short attention span; and that the defendant was functioning at a mental age of 7 years. Communication with the defendant was difficult. It is apparent to us that the defendant's subnormal intelligence was an important but not decisive factor leading the trial judge to suppress his confession and statement. Certainly the defendant could not knowingly and intelligently waive his rights if he was incapable of understanding what those rights were.

The State argues in its brief that subnormal mentality does not, by itself, make a confession involuntary, and we agree. In *People v. Hester*, 39 Ill.2d 489, 237 N.E.2d 466, it is clearly stated that such fact is not determinative but is one of many factors to be considered upon the issue of voluntariness. The trial court in this case was obviously aware of the decisional law applicable to the issues presented to him for determination. In his memorandum decision, the trial court noted that he was dealing with additional factors including the fact that some 2 months subsequent to the taking of the statements, defendant requested and there was held a competency hearing wherein a jury determined that the defendant did not understand the nature of the charges; that he would be unable to cooperate with counsel. The trial court took note of the attempted suicide and the other factors testified to which clearly indicated that the defendant was unable to understand the nature of the warnings given to him, sometimes in rote fashion. It is clear from this record that in addition to the foregoing factor, the defendant was interrogated somewhat continuously from 7:30 P.M. to about 4 A.M. There were no family members or attorneys present at all during that time.

■■ Here, as in *Baker*, the trial judge saw the defendant, observed him and arrived at a conclusion predicated upon such observation and the evidence presented that the defendant did not knowingly and intelligently waive his rights. The finding of the trial court will be sustained unless contrary to the manifest weight of the evidence. Our conclusion is that such finding here is not contrary to the manifest weight of the evidence. Accordingly, the judgment of the circuit court of Macon County should be, and the same is, affirmed.

Affirmed.

SMITH, P. J., and SIMKINS, J., concur.